[No. C021729. Third Dist. May 30, 1996.]

MARKO SKRBINA, Plaintiff and Appellant, v.
FLEMING COMPANIES, INC., et al., Defendants and Respondents.

**COUNSEL**

William S. Morris for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Dale E. Fredericks and Anna E. Goodwin for Defendants and Respondents.

**OPINION**

**SIMS, Acting P. J.**—Plaintiff Marko Skrbina appeals from the dismissal of his employment discrimination action following the grant of summary judgment to defendants Fleming Companies, Inc. (Fleming), Jim O'Bra, and Leighton Carlson. We shall conclude plaintiff's action is barred by a written release agreement given by plaintiff to his employer in exchange for more than $8,000 in severance benefits. We shall therefore affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

*Plaintiff's work history.*

Plaintiff, an immigrant to the United States of Croatian origin, was born in 1931. In 1979 he began working as a forklift maintenance mechanic at the Milpitas warehouse now owned by Fleming. Fleming acquired the warehouse in 1986 and became plaintiff's employer. Defendant O'Bra was Fleming's human resources manager at the warehouse from September 1988 to October 1992. Defendant Carlson was plaintiff's immediate supervisor.

During his employment with Fleming, plaintiff repeatedly complained of unsafe working conditions and harassment. In 1988 he filed (but did not serve) a lawsuit against Fleming, alleging employment discrimination based on national origin, in Santa Clara County.[1]

On August 28, 1991, plaintiff went on disability. He remained in that status as of August 1, 1992.

[1]In November 1990 he filed a charge of discrimination based on age and national origin with the federal Equal Employment Opportunity Commission (EEOC), and in February 1991 he filed a charge with the EEOC alleging retaliatory treatment. The record does not reveal how the EEOC disposed of these charges. In any event, as we shall explain, in his subsequent lawsuit herein he did not state claims for unlawful discrimination under any federal law other than the Americans With Disabilities Act (42 U.S.C. § 12101 et seq.).

*Fleming's reduction in force and the memorandum of agreement.*

In June 1992, Fleming lost a significant client and decided to consolidate the Milpitas warehouse with another, a move which would necessitate the layoff of a substantial number of employees. Fleming and the union local which represented employees at the warehouse, including plaintiff, negotiated a memorandum of agreement (MOA) and a letter of understanding with respect to the consolidation, which were signed by representatives of the company and the union on August 31, 1992.

The MOA covers "all employees employed as of June 22, 1992, and who are subject to the collective bargaining agreement by and between Fleming Foods West, Inc., Milpitas division and International Brotherhood of Teamsters Local 287, and who are permanently laid off as a result of the decision to consolidate the Milpitas division with the Sacramento division or as a result of the loss of Pak ['N] Save business." The MOA provides for severance benefits to be paid to all covered employees who first signed a release of all claims against Fleming and its affiliates, agents, and employees, except for unemployment compensation and worker's compensation claims. It also specifically provides that employees off work due to disability would be eligible for severance benefits.

The letter of understanding spells out the details of the severance package, including Fleming's promise to pay additional sums into the employees' pension fund.

*Plaintiff's layoff and subsequent events.*

Plaintiff received notice of layoff effective August 1, 1992.

On September 18, 1992, plaintiff filled out and signed a form headed "San Francisco Bay Division Closure Option Form," on which he chose the option providing: "When released by San Francisco Bay Division the rights provided in the Collective Bargaining Agreement and Memorandum of Understanding will apply."[2]

On October 5, 1992, plaintiff signed a release in order to obtain his severance benefits. This document, headed "Severance Agreement and Release," states: "In consideration of the additional health and welfare benefits and severance benefits and other consideration provided me by Fleming

---

[2]The other option, which plaintiff did not check, provided: "Remain on the San Francisco Bay Division seniority list either in a bid position or in layoff status in accordance with the Collective Bargaining Agreement and my seniority ranking."

Companies, Inc. in connection with the consolidation of the Milpitas facility with the Sacramento facility, I hereby completely release and forever discharge Fleming Companies, Inc. ('Fleming') and any affiliated and parent companies and their officers, directors, agents, and employees from any claims, rights, demands, actions, obligations, character [*sic*], known or unknown, which I may now have, have ever had, or may in the future have (exclusive of any workers compensation matter) *regarding my employment, benefits, and separation from Fleming including any and all claims under state or federal employment laws and regulations.*" (Italics added.) Plaintiff read the release before signing it, did not ask anyone's advice about whether to sign it, and signed it "willingly" because he wanted money to pay medical bills. After signing the release he received the severance benefits to which he was entitled, a sum in excess of $8,000.

On July 28, 1993, plaintiff filed complaints against defendants (as well as individual Fleming employees not parties to this action) with the state Department of Fair Employment and Housing (DFEH). As to defendants, he alleged that from May 1992 through August 1, 1992, he "was denied reasonable accommodation and reinstatement to the position of Journeyman Mechanic and ultimately laid-off from this position by the Respondent effective August 1, 1992" based on his age and disability.[3]

On September 5, 1993, DFEH notified plaintiff that it would not file claims on his behalf and issued him "right-to-sue" letters as to all parties named in his complaints.

*The lawsuit.*

On October 5, 1993, plaintiff filed a complaint against defendants for unlawful discrimination and wrongful discharge. He stated three "causes of action": (1) employment discrimination under California's Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq., based on age, disability, mental condition, and national origin; (2) violation of the federal Americans With Disabilities Act (42 U.S.C. § 12101 et seq.); and (3)

---

[3]After plaintiff filed suit alleging causes of action which included employment discrimination based on national origin, the trial court granted summary adjudication to defendants as to this theory because plaintiff had not mentioned national origin in his DFEH filings and thus had failed to exhaust administrative remedies as to this theory. The parties dispute whether DFEH claims allegedly filed against persons other than defendants should have put defendants on notice as to plaintiff's national-origin theory. In light of our conclusion that plaintiff's signed release barred the filing of any suit for discrimination on any theory, we need not reach this question.

wrongful termination in violation of public policy based on retaliation for complaints about workplace safety.[4]

On January 5, 1994, defendants removed the action to federal court. After plaintiff voluntarily dismissed his federal cause of action, the federal district court remanded the matter to state court.

On September 6, 1994, defendants demurred to the complaint, alleging that plaintiff had failed to exhaust his administrative remedies as to his two surviving "causes of action." Although the demurrer purported to be directed at the complaint as a whole, with respect to the first "cause of action" defendants asserted only that plaintiff had failed to allege discrimination based on national origin in his DFEH complaints, of which they requested judicial notice (implicitly conceding that he had exhausted his administrative remedies as to age and disability). They asked that the trial court dismiss the complaint with instructions that plaintiff amend it so as to state only a "cause of action" for FEHA discrimination based on age or disability.

The trial court tentatively overruled the demurrer at a hearing on October 19, 1994.[5]

On October 27, 1994, the parties entered into a stipulation and order dismissing plaintiff's FEHA claims as to disability and mental condition.

The trial court entered an order overruling defendants' demurrer on February 3, 1995. The order did not direct defendants to answer the complaint.

Also on February 3, 1995, defendant Fleming filed a pleading, in which the individual defendants joined, styled "Demurrer . . . Or, In the Alternative, Motion for Summary Adjudication." The new demurrer was based on the theory that plaintiff's entire suit was barred by another pending action, the in propria persona complaint which plaintiff filed against Fleming in 1988 in Santa Clara County.[6] The motion for summary adjudication sought the dismissal of plaintiff's FEHA "cause of action" based on the one-year statute of limitations of Government Code section 12960 and failure to

---

[4]As we explain further in part I of the Discussion, the first "cause of action" for violation of the FEHA actually lumped together separate causes of action based on each of the alleged grounds of discrimination.

[5]In doing so, the court declined to take judicial notice of plaintiff's DFEH filings. However, the court's subsequent order states that its ruling is without prejudice to a subsequent motion for dismissal of plaintiff's national origin claim by way of summary judgment.

[6]Fleming's counsel submitted a declaration stating that she had just learned of this complaint through discovery.

exhaust administrative remedies, and the dismissal of plaintiff's wrongful termination action based on the one-year statute of limitations of Code of Civil Procedure section 340, subdivision (3).

On March 7, 1995, plaintiff attempted to take Fleming's default on the ground that it had not answered the complaint within the statutory period after the overruling of its first demurrer. Subsequently, plaintiff filed opposition to defendant's "demurrer/summary adjudication" motion.

On March 21, 1995, the trial court overruled Fleming's demurrer, but rejected plaintiff's contention that the demurrer was procedurally improper. The court granted summary adjudication as to plaintiff's FEHA cause of action for national-origin discrimination because he had failed to exhaust his administrative remedies as to this theory of discrimination, not having alleged it in his DFEH complaints. The court also granted summary adjudication as to plaintiff's cause of action for wrongful termination because he had waited more than one year after his layoff before filing suit. However, the court denied summary adjudication of plaintiff's FEHA cause of action for age discrimination because plaintiff had raised a triable issue of fact as to whether defendants' alleged violation continued after the date of his layoff. The court entered a formal order to this effect on April 18, 1995.

All defendants answered the complaint on March 31, 1995.

On April 26, 1995, defendants moved for summary judgment on plaintiff's remaining cause of action, alleging two new theories: (1) plaintiff's suit was preempted by section 301 of the federal Labor Management Relations Act (29 U.S.C. § 185(a)) because its subject matter was covered by a collective bargaining agreement which must be construed under that statute; and (2) plaintiff's signed release barred his suit under theories of waiver or accord and satisfaction.

In opposing the motion, plaintiff asserted inter alia that he had alleged a cause of action for violation of the "Federal Age Discrimination Act" (i.e., the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.) and contended that his release was not valid inter alia because it did not conform to the minimum standards of the Older Workers' Benefits Protection Act (OWBPA) (29 U.S.C. § 626(f)(1)), which is part of the ADEA.[7] Defendants' counsel wrote to plaintiff's counsel asking whether the reference to the purported ADEA claim was an oversight or whether plaintiff

---

[7] 29 United States Code section 626(f)(1), provides (italics added): "An individual may not waive any right or claim *under this chapter* [the ADEA] unless the waiver is knowing and voluntary. . . . [A] waiver may not be considered knowing and voluntary unless at a minimum— [¶] (A) the waiver is part of an agreement between the individual and the

intended to state such a claim even though he had not pleaded it in his complaint. Plaintiff's counsel, in a letter dated March 30, 1995, conceded that he had not made a claim pursuant to the ADEA, but maintained that if he could apply the OWBPA's notice provisions to plaintiff's existing state law claims he intended to do so.

The trial court entered an order granting defendants' motion, based only on the release theory. The court found that plaintiff had failed to raise a triable issue of fact as to the validity and scope of the release. The court further found that plaintiff could not avoid the effect of his release by invoking the OWBPA because he had abandoned any claim under the ADEA which he might otherwise have had, as shown by the correspondence of counsel.

The court thereafter entered judgment in accordance with its order.

DISCUSSION

I

*The Trial Court Properly Refused to Enter Defendant's Default*

■ Asserting (without citing decisional authority) that Code of Civil Procedure sections 430.10-430.80 do not authorize successive demurrers to the same complaint and that defendants' only proper procedure after the trial court overruled their first demurrer was to answer the complaint, plaintiff

---

employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate; [¶] (B) the waiver specifically refers to rights or claims arising under this chapter; [¶] (C) the individual does not waive rights or claims that may arise after the date the waiver is executed; [¶] (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled; [¶] (E) the individual is advised in writing to consult with an attorney prior to executing the agreement; [¶] (F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or [¶] (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement; [¶] (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired; [¶] (H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to— [¶] (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and [¶] (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program."

contends that the trial court should have stricken defendants' second demurrer and permitted the entry of their default as plaintiff requested. We cannot agree.

A defendant may demur to a complaint within 30 days after its service. (Code Civ. Proc., § 430.40, subd. (a).) A demurrer may be taken to the whole complaint or to any of the causes of action stated therein. (Code Civ. Proc., § 430.50, subd. (a).)

"Following a ruling on a demurrer, unless otherwise ordered, leave to answer . . . within 10 days shall be deemed granted . . . ." (Cal. Rules of Court, rule 325(e).) However, if a demurrer is not directed to all causes of action, "[u]nless otherwise ordered, defendant shall have 10 days *to move to strike, demur, or otherwise plead to the complaint* or the remaining causes of action following . . . the overruling of the demurrer . . . ." (Cal. Rules of Court, rule 325(g), italics added.) Here, as we shall explain, defendants' demurrer was not addressed to all causes of action, so that, under rule 325(g), they had 10 days to demur again and their second demurrer was timely.

■ "California defines a 'cause of action' in accord with Pomeroy's 'primary right' theory. [Citation.] A cause of action consists of (1) a *primary right* possessed by the plaintiff and a corresponding *primary duty* imposed upon the defendant, and (2) a *delict* or *wrong* committed by the defendant which constitutes a breach of such primary right and duty. [Citation.]" (*Miranda* v. *Shell Oil Co.* (1993) 17 Cal.App.4th 1651, 1658 [26 Cal.Rptr.2d 655]; 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 23, pp. 66-67.)

The cause of action is based on the injury to the plaintiff, not on the legal theory or theories advanced to characterize it. Thus, if a plaintiff states several purported causes of action which allege an invasion of the same primary right he has actually stated only one cause of action. On the other hand, if a plaintiff alleges that the defendant's single wrongful act invaded two different primary rights, he has stated two causes of action, and this is so even though the two invasions are pleaded in a single count of the complaint. (*Lilienthal & Fowler* v. *Superior Court* (1993) 12 Cal.App.4th 1848, 1854-1855 [16 Cal.Rptr.2d 458]; *Freidberg* v. *Cox* (1987) 197 Cal.App.3d 381, 388 [242 Cal.Rptr. 851]; *Zambrano* v. *Dorough* (1986) 179 Cal.App.3d 169, 174 [224 Cal.Rptr. 323]; 4 Witkin, *op. cit. supra*, § 25, at p. 69.)

■ Here, plaintiff's first "cause of action" under the FEHA actually, though inartfully, pleaded several causes of action: one for violation of his right to be free of employment discrimination based on national origin,

another for violation of his right to be free of employment discrimination based on age, and another for violation of his right to be free of employment discrimination based on disability.[8]

Defendants' first demurrer, though nominally taken to the whole complaint, in fact addressed only one of plaintiff's three FEHA causes of action. As we have noted, defendants' argument that plaintiff had failed to exhaust his administrative remedies as to the first "cause of action" pertained *only* to his theory of discrimination based on national origin. Defendants implicitly conceded that he had exhausted his administrative remedies as to discrimination based on age and disability and asked the trial court to direct him to amend his complaint so as to restrict it to those FEHA grounds. Thus, the demurrer in effect was to less than all causes of action pleaded in the first count of the complaint.

Moreover, in overruling the demurrer the trial court did not order defendants to answer the complaint. Therefore, under California Rules of Court, rule 325(g), defendants had 10 days following the entry of the trial court's order to "demur, or otherwise plead to the complaint . . . ." They filed their "demurrer, or in the alternative, motion for summary adjudication"[9] on February 3, 1995, the day on which the court entered its order. The demurrer was both authorized and timely. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1995) ¶¶ 5:56, 7:34.3, pp. 5-13, 7-15.)

The trial court did not err by refusing to strike the second demurrer, which was properly made, or by refusing to enter defendants' default.

II

*The Trial Court Properly Granted Summary Judgment Based on the Release Agreement Executed by Plaintiff*

Summary judgment is properly granted to a defendant if it shows either that one or more essential elements of the plaintiff's cause of action cannot be separately established or that there is an affirmative defense which bars recovery, and the plaintiff fails to set forth specific facts showing a triable issue of material fact as to that cause of action or defense. (Code Civ. Proc., § 437c, subds. (n), (o)(2).)

---

[8]As noted, he initially also pleaded a cause of action under this heading for violation of his right to be free of employment discrimination based on mental condition, but voluntarily dismissed this cause of action before defendants' second demurrer.

[9]We express no view as to whether it was appropriate to file a pleading so styled. We consider here only plaintiff's claim of error as to the demurrer.

Plaintiff raises arguments to dispute all the theories on which defendants sought summary judgment or summary adjudication below. We conclude, however, as did the trial court, that defendants were entitled to summary judgment because plaintiff failed to show the existence of a triable issue of fact as to the validity and scope of the release he signed, and absent such an issue of fact the release bars his suit as a matter of law. Thus we need not reach the parties' contentions as to defendants' other theories.

Plaintiff attempts to show that triable issues of fact exist as to both the validity of his release (i.e., whether it was executed knowingly and voluntarily) and its scope (i.e., whether it is broad and clear enough on its face to cover the claims brought in this action). He also asserts that he was not subject to the MOA under which the release was offered to him because he was not working as of the date it went into effect. He is wrong on all of these points.

A. *The release was valid.*

■ Civil Code section 1541 provides: "An obligation is extinguished by a release therefrom given to the debtor by the creditor, upon a new consideration, or in writing, with or without new consideration."

■ In general, a written release extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence. (*Winet* v. *Price* (1992) 4 Cal.App.4th 1159, 1172-1173 [6 Cal.Rptr.2d 554]; *Edwards* v. *Comstock Insurance Co.* (1988) 205 Cal.App.3d 1164, 1169 [252 Cal.Rptr. 807]; *Shiver* v. *Liberty Building-Loan Assn.* (1940) 16 Cal.2d 296, 306 [106 P.2d 4]; *Weddle* v. *Heath* (1931) 211 Cal. 445, 454 [295 P. 832]; *Moore* v. *Rogers* (1958) 157 Cal.App.2d 192, 196 [320 P.2d 524]; *Crow* v. *P.E.G. Construction Co., Inc.* (1957) 156 Cal.App.2d 271, 277-278 [319 P.2d 47]; *Faye* v. *Feldman* (1954) 128 Cal.App.2d 319, 328 [275 P.2d 121]; *Marshall* v. *Packard-Bell Co.* (1951) 106 Cal.App.2d 770, 775 [236 P.2d 201]; *W. R. Campbell Co.* v. *Sears, Roebuck & Co.* (1934) 136 Cal.App. 765, 771-772 [29 P.2d 910].)

" 'The general rule is that when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and imposition, bound by its contents, and is estopped from saying that its provisions are contrary to his intentions or understanding; but it is also a general rule that the assent of a party to a contract is necessary in order that it be binding upon him, and that, if the circumstances of a transaction are such that he is not estopped from setting up his want of assent, he can be

relieved from the effect of his signature if it can be made to appear that he did not in reality assent to it.' (*Smith* v. *Occidental etc. Steamship Co.* (1893) 99 Cal. 462, 470-471 . . . .)" (*Edwards* v. *Comstock Insurance Co., supra,* 205 Cal.App.3d at pp. 1167-1168 [construing release agreement] followed in *Winet* v. *Price, supra,* 4 Cal.App.4th at pp. 1168-1169.)

■ As to whether he signed the release knowingly and voluntarily, plaintiff asserts first that he never intended to abandon his discrimination and harassment claims and that neither the company nor the union told him that signing the release might affect those claims; he was told only that he must sign in order to collect his severance benefits. Absent fraud, deception, misrepresentation, duress, or undue influence, however, these assertions do not raise a triable issue as to the knowing and voluntary character of his act. By his own admission, he read the release, then signed it "willingly" to obtain the benefits provided in return for his signature. He has offered no evidence that defendants told him the release did not encompass employment discrimination claims or that he asked anyone's advice as to whether it did. If he signed the release on the mere unspoken belief that the release did not encompass such claims, despite express language in the release to the contrary, he may not now rely on his unspoken intention not to waive these claims in order to escape the effect of the release. (*Edwards* v. *Comstock Insurance Co., supra,* 205 Cal.App.3d at pp. 1167-1168.) To the extent he argues that he was coerced into signing the release because defendants told him he would not otherwise get his severance benefits, the argument fails because he was entitled to those benefits only under the terms of the MOA, which included signing the release.

B. *The antiwaiver provisions of the ADEA do not apply in this case.*

■ Plaintiff asserts further that his waiver was not knowing and voluntary because the terms of the release did not meet the minimum standards for waivers under federal law, namely the OWBPA as set out in 29 United States Code section 626(f)(1). (See fn. 7, *ante.*)

However, the OWBPA on its face covers only "right[s] or claim[s] *under this chapter* . . . ." (i.e., the ADEA). (29 U.S.C. § 626 (f)(1), italics added.) In general, the ADEA (29 U.S.C. § 621 et seq.) bans age discrimination by employers employing more than 20 persons in industries affecting commerce. (*Aalgaard* v. *Merchants Nat. Bank, Inc.* (1990) 224 Cal.App.3d 674, 693 [274 Cal.Rptr. 81].)

By its plain terms, 29 United States Code section 626(f)(1) applies only to rights or claims under the ADEA. It does not apply to a waiver of claims

based on state law, which are the only claims at issue in the complaint upon which summary judgment was granted.

Here, it is clear plaintiff has failed to pursue any rights or claims under the ADEA. We know this for three reasons. First, plaintiff's complaint failed to allege any rights or claims under the ADEA. Second, in his letter of March 30, 1995, relied on by the trial court, plaintiff conceded he had made no claim under the ADEA. Third, on appeal, plaintiff makes no contention that he pursued claims under the ADEA.

The trial court properly concluded the antiwaiver provisions of the ADEA were inapplicable to plaintiff's release of his state law claims.

### C. *The release covered plaintiff's FEHA claims.*

 Even assuming he waived some claims knowingly and voluntarily, however, plaintiff asserts that a triable issue of fact remains as to whether he waived the claims he now seeks to bring. As he construes the release, either it excludes his FEHA claims on its face or it is ambiguous in this respect. He argues that the category of claims it covers—those "regarding 'employment, benefits, and separation' "—does not include FEHA claims because the FEHA "is not an 'employment law' in the same sense as workers' compensation or wage and hour laws." Moreover, according to plaintiff, extrinsic evidence shows that the parties to the MOA did not intend FEHA claims to be covered under the release. These contentions lack merit.

 "Release, indemnity and similar exculpatory provisions are binding on the signatories and enforceable so long as they are . . . 'clear, explicit and comprehensible in each [of their] essential details. Such an agreement, read as a whole, must clearly notify the prospective releasor or indemnitor of the effect of signing the agreement.' " (*Powers* v. *Superior Court* (1987) 196 Cal.App.3d 318, 320 [242 Cal.Rptr. 55].)

"To be effective, a release need not achieve perfection; only on Draftsman's Olympus is it feasible to combine the elegance of a trust indenture with the brevity of a stop sign." (*National & Internat. Brotherhood of Street Racers, Inc.* v. *Superior Court* (1989) 215 Cal.App.3d 934, 938 [264 Cal.Rptr. 44].)

 As relevant here, the release provides (italics added): ". . . I hereby completely release and forever discharge [defendants] from any claims . . . which I may now have, have ever had, or may in the future have (exclusive of any workers['] compensation matter) *regarding my employment, benefits, and separation from Fleming including any and all claims*

*under state or federal employment laws and regulations.*" On its face, this language could not be plainer. "[A]ny and all claims under state or federal employment laws and regulations" cannot reasonably be construed so as to exclude claims of discrimination or harassment in employment, which are patently claims "regarding . . . employment."[10] Moreover, the law under which plaintiff sues is called the Fair *Employment* and Housing Act. (Gov. Code, § 12900.) The provision which defines the rationale of the FEHA declares: "[I]t is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold *employment* without discrimination or abridgment . . . ." (Gov. Code, § 12920, italics added.) And the specific provision on which plaintiff relies to state a cause of action begins: "It shall be an unlawful *employment* practice . . . ." (Gov. Code, § 12940, italics added.)

Plaintiff cites no authority for the remarkable proposition that a law is not an "employment law" unless it deals with wages and hours or workers' compensation. If plaintiff means to contend that the FEHA is not an "employment law" because it does not regulate the terms and conditions of employment, he is wrong: the FEHA does so by establishing the right to be free of unlawful discrimination and harassment as a fundamental term and condition of employment.

We also reject plaintiff's contention that extrinsic evidence raises a triable issue of fact whether the parties to the MOA intended to include such claims within the scope of the release. Extrinsic evidence is admissible in interpreting a written release only if relevant to prove a meaning to which the language is "reasonably susceptible." (*Winet* v. *Price, supra,* 4 Cal.App.4th at p. 1165, citing *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) Attempting to meet this test, plaintiff first asserts, apparently with respect to the MOA's language concerning "employment, benefits, and separation": "FLEMING itself intended that the release be limited in effect to issues connected to the reduction in force." He then cites the deposition testimony of defendant O'Bra that the company and the union intended the release to cover "claims arising from [an employee's] employment with Fleming and arising from his or her layoff . . . ." Finally, he asserts: "In other words, if the claim did not arise *from employment and the layoff,* it was not the intent of the parties to include it in the release." (Italics added.) These are indeed "other words," and they do not reasonably paraphrase either the language of the MOA or that of O'Bra.

---

[10]"Regarding" means "with respect to: CONCERNING." (Webster's New Internat. Dict. (3d ed. 1993) p. 1991.) In ordinary usage, a claim of discrimination or harassment on the job evidently "concerns" the job and occurs "with respect to" it. No authority cited by plaintiff suggests anything to the contrary.

"Employment, benefits, and separation" (the MOA's language) is disjunctive on its face: "claims regarding" any of these three matters are covered thereunder. The same is true of O'Bra's reference to "claims arising from . . . employment with Fleming and arising from . . . layoff." Thus O'Bra's statement is consistent with the terms of the MOA. Plaintiff's purported paraphrase of O'Bra's statement is consistent with neither. We conclude that plaintiff has not shown the language of the MOA to be reasonably susceptible to the interpretation he advances.

D. *Plaintiff was covered by the MOA.*

■ Finally, plaintiff asserts that he was not covered by the MOA in the first place. He reasons as follows. Paragraph 21 of the MOA provides: "This agreement does not apply to any employee currently on layoff status and who has not worked since June 22, 1992." Plaintiff went on disability in 1991 and did not return to work. He received notice of layoff effective August 1, 1992. The MOA was signed by the company and the union on August 31, 1992; thus plaintiff was "currently on layoff status" as of then.

The short answer to this contention is that plaintiff waived it by signing the release and accepting the benefits which were available only pursuant to the MOA. But even assuming the contention is not waived, other provisions of the MOA and uncontroverted extrinsic evidence show that the parties to the MOA intended it to cover employees such as plaintiff who were laid off before negotiations over the MOA had been completed.

First, paragraph 1 of the MOA provides: "This agreement shall cover all employees *employed* as of June 22, 1992, and who are subject to the collective bargaining agreement by and between Fleming Foods West, Inc., Milpitas division and International Brotherhood of Teamsters Local 287, and who are permanently laid off as a result of the decision to consolidate the Milpitas division with the Sacramento division or as a result of the loss of Pak ['N] Save business." (Italics added.) Plaintiff was employed as of June 22, 1992 (even though not then working), he belonged to Local 287, and he was permanently laid off for one or both of the reasons mentioned; thus this paragraph on its face applies to him.

Second, paragraph 18 of the MOA provides: "Employees off work due to disability or industrial injury shall be entitled to receive the benefits contained in this severance package." Plaintiff was "off work due to disability" before his layoff; thus this paragraph also applies to him on its face.

Third, defendant O'Bra, a member of the company team that negotiated the MOA, declared that at the union's insistence the parties agreed to include

within the MOA employees such as plaintiff who had been laid off due to the loss of Pak 'N Save's business before the MOA was signed, and that this intention was reflected in paragraph 1. Since paragraph 1 on its face reveals the parties' intent to cover workers who were employed as of June 22, 1992, without regard to the dates of their subsequent layoffs, O'Bra's testimony is admissible to prove that this provision was intended to cover persons in plaintiff's situation. (*Winet* v. *Price, supra,* 4 Cal.App.4th at p. 1165.)

In conclusion, plaintiff has shown no triable issue of fact as to the binding character of his release. That release bars all causes of action pleaded in plaintiff's complaint. The trial court therefore properly granted summary judgment to defendants.

### DISPOSITION

The judgment is affirmed.

Scotland, J., and Nicholson, J., concurred.